**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, § § § § § Plaintiff, § § § vs. § § § PHOENIX AMERICAN HOSPITALITY, LLC, a § Delaware limited liability company, and § WILLIAM LEE "PERCH" NELSON, § § Defendants. § | Civil Action No.: 3:26-cv-01846 |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Phoenix American Hospitality, LLC, a Delaware limited liability company ("PAH"), and William Lee "Perch" Nelson (together, "Defendants"), alleges as follows:

## SUMMARY OF THE ACTION

1. From March 2022 through July 2024, Defendants raised approximately $86 million from over 2,000 retail investors through deceptive conduct that included making untrue statements regarding the assets held by, and profitability of, two hotel-focused investment funds.

2.      PAH, through Nelson, raised this money while claiming that one fund owned as many as 11 hotels. In reality, this fund owned only a preferred equity interest in a single hotel until January 2024, when it acquired interests in other hotels. PAH, through Nelson, also made untrue statements that both funds made regular profit distributions of up to 12% per year to investors, when neither of the funds was profitable, and distributions were primarily funded by returns of investor capital.

3.      As part of the deceptive conduct, Nelson directed a consulting firm to create and disseminate similar untrue statements in marketing materials to investors and potential investors.

4.      By engaging in this and the other conduct described herein, Defendants have violated and, unless restrained and enjoined there is a reasonable likelihood of future violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## JURISDICTION AND VENUE

5.      The Commission brings this action pursuant to authority conferred on it by Sections 20(b) and 20(d)(1) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)(1)] and Sections 21(d)(1), (3), and (5), and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (3), and (5), and 78u(e)] to restrain and enjoin Defendants from engaging in the acts, practices, and courses of business described in this Complaint and similar acts, practices, and courses of business.

6.      Defendants, directly or indirectly, singly and in concert, made use of the means or instruments of transportation or communications in interstate commerce, the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions,

acts, practices, and courses of business alleged in this Complaint, certain of which occurred within this District.

7.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d)(1), (3), and (5), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (3), and (5), 78u(e), and 78aa(a)].

8.     Venue is proper in the Northern District of Texas pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and 28 U.S.C. § 1391(b). PAH maintains its principal place of business in this District, Nelson is an inhabitant of this District, and certain of the acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in this District, including the offer and sale of securities.

## DEFENDANTS AND RELATED ENTITIES

9.     Defendant **Phoenix American Hospitality, LLC** ("PAH") is a Delaware limited liability company with its principal place of business in Dallas, Texas. PAH manages investment vehicles that invest in U.S.-based hotels. PAH is wholly owned by Nelson and a trust he controls.

10.     Defendant **William Lee "Perch" Nelson**, age 65, is a resident of Dallas, Texas. Nelson founded PAH in 2009 and serves as its president.

11.     In 2018, PAH and Nelson formed a corporation to invest in U.S.-based hotels using capital raised from retail investors pursuant to the Regulation A offering exemption [17 C.F.R. §§ 230.251–263] ("REIT I"). REIT I is a Delaware corporation with its principal place of business in Dallas, Texas. At all relevant times, Nelson served as the chief executive officer ("CEO") and a director of REIT I. PAH and Nelson marketed REIT I as a real estate investment

trust. But REIT I has not yet qualified as a real estate investment trust for U.S. income tax purposes.

12.    In 2023, PAH and Nelson formed a second corporation to invest in U.S.-based hotels using capital raised from retail investors pursuant to the Regulation A offering exemption [17 C.F.R. §§ 230.251–263] ("REIT II," and together with REIT I, the "PAH REITs"). REIT II is a Delaware corporation with its principal place of business in Dallas, Texas. At all relevant times, Nelson served as CEO and a director of REIT II. PAH and Nelson marketed REIT II as a real estate investment trust. But REIT II has not yet qualified as a real estate investment trust for U.S. income tax purposes.

## FACTUAL ALLEGATIONS

### I.    PAH and Nelson Offered and Sold Securities Issued by the PAH REITs.

13.    In or about June 2021, PAH and Nelson engaged a consulting firm that specialized in directly marketing Regulation A and other exempt securities offerings to investors. The consulting firm helped PAH and Nelson create and successfully launch a marketing campaign that targeted retail investors through multiple means, including social media advertisements, a new website specific to REIT I, emails from PAH and Nelson, and live webinars hosted by Nelson that were later posted to PAH websites and YouTube.

14.    PAH and Nelson provided, approved, and had ultimate authority over the substantive content of the statements concerning the PAH REITs disseminated through the marketing channels established by the consulting firm.

15.    Beginning no later than March 2022 and continuing through July 2024 (the "Relevant Period"), PAH and Nelson offered and sold securities in the form of common stock issued by the PAH REITs via the marketing campaign described in paragraphs 13 and 14 and by

4

other means. Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] define "security" to include any "stock."

16.     During the Relevant Period, PAH and Nelson raised about $56.6 million from around 1,300 investors in REIT I. These investors obtained about 6 million shares of common stock in REIT I. PAH stopped soliciting new investments in REIT I in or around September 2023, when it launched REIT II. PAH and Nelson then raised about $29.4 million from around 750 investors in REIT II during the Relevant Period. These investors obtained about 3.1 million shares of common stock in REIT II.

**II.     PAH, Through Nelson, Made Untrue Statements of Material Fact to Investors.**

17.     In raising funds from investors, PAH and Nelson made written and oral untrue statements of material fact regarding the number of hotels owned by REIT I and the profitability of the PAH REITs. These untrue statements contributed to an increase in fundraising for REIT I. Indeed, prior to March 2022, REIT I raised approximately $4.7 million from around 150 accredited investors. Thereafter, REIT I raised approximately $56.6 million from around 1,300 investors in less than two years, and REIT II raised approximately $29.4 million from around 750 investors in less than a year.

**A.     Untrue Statements Concerning REIT I's Hotel Investments**

18.     From inception until January 2024, REIT I's only hotel investment was a September 2020 $1.5 million preferred equity investment in a single hotel. However, when marketing REIT I from March 2022 until October 2023, PAH and Nelson made materially untrue statements in oral and written communications to investors and potential investors indicating that REIT I owned more than one hotel, including, but not limited to, the statements below.

19.     On March 22, 2022, PAH sent a marketing email to potential investors stating that REIT I  "acquired a preferred interest in two new hotels" located in Fort Wayne, Indiana, and announced that the transaction brought REIT I's "total to three hotels owned and operated."

20.     On August 10, 2022, PAH, through Nelson, sent a marketing email to existing REIT I investors in which Nelson stated "that four (4) hotel properties have been added to your REIT select service portfolio, with a fifth closing very soon, with more on the horizon. They are all performing very well, ahead of budget in fact." Nelson listed the four hotels in his email.

21.     On October 12, 2022, Nelson wrote to the consulting firm that "[w]e are announcing the addition of 7 more hotels, today" and directed the firm to update REIT I's website to make the untrue statement that REIT I had "already purchased . . . eleven (11) hotels," even though at that time REIT I only owned a preferred equity interest in a single hotel.

22.     Nelson further directed the consulting firm to conduct an email campaign to tout each of the seven new hotels REIT I had allegedly purchased in separate messages sent to potential and existing investors in or about October 2022.

23.     From in or around November 2022 through July 2023, PAH and Nelson sent automatic "welcome" emails to "new leads" from Nelson's personal email account that stated REIT I had "already purchased eleven (11) hotels at COVID devalued pricing."

24.     PAH, through Nelson, made similar untrue statements concerning REIT I's hotel investments during webinars he hosted in December 2022, January 2023, and February 2023. In those webinars, Nelson made untrue statements that REIT I had acquired 11 hotels and, in the December 2022 webinar, estimated that the purchases resulted in "probably . . . $120 million worth of assets in this fund thus far." In addition to the live broadcasts, recordings of the

webinars including the untrue statements remained available for investors to review on PAH's YouTube channel through at least the end of the Relevant Period.

25.     The foregoing statements about the number of hotels REIT I owned were untrue because REIT I did not, at the time the statements were made, own the number of hotels PAH and Nelson stated. From July 2019 to January 2024, REIT I's only hotel investment was the preferred equity investment it made in a single hotel in 2020.

26.     The above untrue statements regarding the hotels owned by REIT I were material to investors and potential investors because statements regarding the assets owned by a company would be important to a reasonable investor.

**B.      Untrue Statements Concerning REIT Investor Distributions from Profits**

27.     Beginning no later than May 2022, PAH and Nelson made materially untrue statements in written and oral communications indicating that the PAH REITs were making up to 12% annualized distributions to investors from profits, including but not limited to the statements below.

28.     In a webinar that aired on or about December 22, 2022, PAH, through Nelson, stated: "In 2022, we paid out to our investors an annualized average distribution of a little bit over 12%."  Nelson then said that "it's important for our investors to know that the REIT structure to stay in compliance of both SEC and IRS guidelines we have to distribute 90% of our operating income." He later said, "again going back to the idea of the REIT having to distribute 90% of their operating income, we paid a bonus distribution this month . . . and the reason we did that was to stay in compliance with . . . the 90% rule."  These statements indicate that REIT I had taxable income and was therefore profitable.  PAH, through Nelson, further made the untrue

7

statement to investors that "monthly [and] bonus distributions . . . are solely based on net operating income."

29.     PAH, through Nelson, reiterated these points in a January 2023 webinar, saying "the investors that were in our . . . REIT fund at year-end were fortunate enough to receive a bonus distribution and that bonus distribution was 18% annualized. The reason that happened was as I mentioned a minute ago is that we had to distribute that income and that was a true up if you will of the distributions to make sure that we were in compliance with the SEC and the IRS rules regarding REITs."

30.     On January 21, 2023, PAH, through Nelson, sent a marketing email to investors and potential investors stating that REIT I significantly outperformed the S&P 500 stock market index during 2022 by "distribut[ing] monthly profits at a 12% annualized rate (over an even longer period – 10/31/21 - 12/31/22)."

31.     In a February 2023 webinar PAH, through Nelson, indicated REIT I had been able to sustain a 12% distribution and said "the reason we're able to do this is because we have acquired 11 hotels in this REIT already and so that's where the operating income is coming from in order to support these distribution levels."  In a later February 2023 webinar, PAH, through Nelson, stated that REIT I's distribution was "dependent on the performance of the hotels" and resulted from, in part, a "great deal of revenue increase."

32.     After REIT I stopped soliciting new investments in September 2023 and PAH launched REIT II, on October 12, 2023, PAH distributed an email to potential investors announcing REIT II and its intent to build on the purported success of REIT I and stated that the PAH REITs "make those payouts [the distributions] from operating profits, which we have a track record of accomplishing."

33.     PAH, through Nelson, also directed the consulting firm to create and disseminate materials containing the untrue statement that the PAH REITs were making up to 12% annualized distributions to investors from profits. For example, Nelson directed the consulting firm to program a REIT II website to automatically generate emails to potential investors who downloaded an investment guide from October 2023 through the remainder of the Relevant Period. The content that Nelson provided for the automatic emails included the untrue statement: "How could you generate PASSIVE MONTHLY INCOME? . . . Operating Profits . . . We own AND operate our hotels . . . We distribute any profits monthly."

34.     PAH, through Nelson, approved the content of an "explainer video" linked in marketing emails and on a REIT II-specific website from at least October 2023 through the remainder of the Relevant Period. The video included a slide stating: "Our first REIT [REIT I] has delivered 12% annualized return, distributed monthly [s]ince 10/31/21." It then showed the following untrue slide:



An actor's voiceover on the video also made the untrue statement while the above slide was projected on the screen that "distributions come from profit generated from running and optimizing our hotels."

35.     During a December 2023 webinar, after a participant asked whether distributions were "dependent on the performance of the hotels in the REIT," Nelson stated: "Absolutely. This

9

is an investment and . . . clearly if the hotels are not producing cash flow to support distributions there will be no distributions, unfortunately. But that has not been the case."

36.     On December 26, 2023, PAH sent a marketing email to potential REIT II investors and stated that a forthcoming "bonus distribution" to investors would be "based on our strong operating profit in Q4."

37.     The foregoing and similar statements about the source of distributions to investors were untrue because the PAH REITs did not make the distributions out of operating income, net income, or profits. At all times from May 2022 through the end of the Relevant Period, neither REIT I nor REIT II had the profits indicated, including specifically at the time of each of the statements made above. REIT I obtained just over $200,000 in total earnings from its single preferred equity hotel investment from inception through December 31, 2022. But it distributed over $1.4 million to investors during the same period. REIT I had about $5,000 in total hotel-related earnings in all of 2023 from its single preferred equity hotel investment. But it distributed over $5 million to investors in 2023. REIT II did not have any hotel assets until the first quarter of 2024, so it could not have generated any operating profit in 2023.

38.     The above untrue statements regarding the source of distributions to investors were material to investors and potential investors because statements indicating that a company had sufficient income or profits to annually pay a 12% distribution would be important to a reasonable investor.

### C.     PAH and Nelson Made These Untrue Statements with Scienter.

39.     Nelson knew or was severely reckless in not knowing, that the above-described statements concerning the number of hotels owned by REIT I and the profitability of the PAH REITs directly and on behalf of PAH were untrue when made.

10

40.    As CEO of the PAH REITs and president of PAH, which managed the PAH REITs, Nelson held ultimate responsibility for all investment decisions made by the PAH REITs. As such, he knew or was severely reckless in not knowing when the PAH REITs had made hotel investments, how much the PAH REITs had invested in those hotels, and whether the PAH REITs were profitable.

41.    Accordingly, Nelson knew, or was severely reckless in not knowing, that REIT I did not own as many as 11 hotels before January 2024. And he knew, or was severely reckless in not knowing, that REIT I only held a preferred equity interest in a single hotel until January 2024.

42.    Similarly, Nelson knew, or was severely reckless in not knowing, that statements indicating the PAH REITs were making investor distributions from income or profits were untrue.  Nelson knew, or was severely reckless in not knowing, that the PAH REITs funded distributions with offering proceeds, not profits.

43.    Throughout the Relevant Period, Nelson exercised control over PAH, was acting within the scope of his authority to make representations on behalf of PAH, and did in fact make the representations described above on behalf of PAH.

44.    The scienter of Nelson is imputed to PAH.

**D.    PAH and Nelson Were the Makers of the Untrue Statements.**

45.    PAH and Nelson made the untrue statements enumerated above. As described above, PAH sent numerous marketing emails to potential and existing investors that contained untrue statements. As the owner and president of PAH, Nelson held ultimate authority over PAH's statements and the substantive content of the statements PAH and Nelson directed the consulting firm to make. Nelson also made untrue statements directly on behalf of PAH,

including in marketing emails he sent from his PAH email account and statements he made orally during investor-facing webinars.

**E.    PAH and Nelson Obtained Money or Property from Their Misconduct.**

46.    During the Relevant Period, the PAH REITs obtained money from investors via the untrue statements made by PAH and Nelson when marketing the PAH REITs. The PAH REITs then paid PAH fees for services it performed under the terms of the PAH REITs' offering circulars. Also, as disclosed in the PAH REITs' offering circulars, the PAH REITs paid fees to a PAH subsidiary that performed onsite management of the PAH REITs' hotels. And Nelson took cash ownership draws from PAH. PAH funded these draws at least in part with payments PAH received from the PAH REITs.

**III.   PAH, Through Nelson, Engaged in Deceptive Conduct to Defraud Investors.**

47.    PAH and Nelson engaged in deceptive acts and practices to defraud investors in connection with the offer and sale of securities described above.

48.    In addition to making the untrue statements identified above, PAH, through Nelson, engaged in other deceptive conduct by directing the consulting firm to create and disseminate untrue statements in marketing materials to investors and potential investors as identified above.

49.    Nelson knew or was severely reckless in not knowing that he was engaging in the deceptive conduct and misstatements alleged above and that the conduct worked to defraud investors.

50.    Throughout the Relevant Period, Nelson exercised control over PAH, was acting within the scope of his authority to direct the consulting firm on behalf of PAH, and directed the consulting firm to make the misrepresentations described above on behalf of PAH.

51.    The scienter of Nelson is imputed to PAH.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (All Defendants)

52.    The Commission realleges and incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

53.    Defendants directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or severely recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

54.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined there is a reasonable likelihood of future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (All Defendants)

55.    The Commission realleges and incorporates by reference paragraphs 1 through 54 as though fully set forth herein.

56.    Defendants directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind: (a) employed devices, schemes, or artifices to

defraud; (b) obtained money or property by means of one or more untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

57.     By virtue of the foregoing, Defendants directly or indirectly violated and, unless restrained and enjoined there is a reasonable likelihood of future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

### **I.**

Find that all Defendants violated the provisions of the federal securities laws as alleged herein;

### **II.**

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

### **III.**

Order the Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court, plus post-judgment interest;

**IV.**

Issue an order, pursuant to the Court's equitable powers, Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], barring Nelson from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**VI.**

Grant such other and further relief as this Court may deem just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated:  June 4, 2026                    Respectfully submitted,


_s/ Keefe Bernstein_
Keefe Bernstein
Texas Bar No. 24006839
United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Telephone: (817) 900-2607
Facsimile: (817) 978-4927
bernsteink@sec.gov

COUNSEL FOR PLAINTIFF
U.S. SECURITIES AND EXCHANGE COMMISSION


Of Counsel:
Rachel Yeates
Colo. Bar No. 45759
United States Securities and Exchange Commission
Denver Regional Office
1961 Stout St., Suite 1700
Denver, CO 80294
Telephone: 303-844-1060
Facsimile: 303-297-3529
yeatesr@sec.gov